# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| KEVIN MOFFIT and KEVIN MYERS, as the representatives of a class of similarly situated persons, and on behalf of the MYMICHIGAN HEALTH 403(B) SAVINGS PLAN,<br><br>        Plaintiffs,<br><br>v.<br><br>MYMICHIGAN HEALTH and THE MYMICHIGAN HEALTH PENSION GOVERNANCE and ADMINISTRATIVE COMMITTEE,<br><br>        Defendants. | Case No. 2:25-cv-10761<br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1.      Plaintiffs Kevin Moffit and Kevin Myers, as the representatives of a class of participants in and on behalf of the MyMichigan Health 403(b) Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), against MyMichigan Health ("MyMichigan") and the MyMichigan Health Pension Governance and Administrative Committee (the "PGAC") (together with MyMichigan, "Defendants").

2.      Defendants breached their fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1105(a)(2) by failing to monitor the Plan's chronically underperforming stable value investment option.

3.      Defendants' failure to remove and replace the Plan's underperforming stable value investment option resulted in substantial losses to the Plan recoverable from Defendants under ERISA, 29 U.S.C. § 1109.

4.      Plaintiffs bring this action on behalf of the Class (as defined herein) and the Plan pursuant to 29 U.S.C. § 1132 to recover the losses resulting from Defendants' ERISA violations and to compel Defendants to implement prudent processes to prevent further losses to the Plan.

## SUMMARY OF CLAIM

5.      Employers that manage workplace retirement savings plans governed by ERISA act in a fiduciary capacity. 29 U.S.C. § 1102(a)(1). Such fiduciaries must act with the "care, skill, prudence, and diligence" such a task requires. 29 U.S.C. § 1104(a)(1)(B). The standard of care, skill, prudence, and diligence required to manage an ERISA plan is often described as "the highest known to the law." *Chao v. Hall Holding Co.,* 285 F.3d 415, 426 (6th Cir. 2002).

6.      Defendants failed to act with the care, skill, prudence, and diligence required of them as ERISA fiduciaries in failing to monitor the Plan's fixed income investment option, the Guaranteed Income Fund ("GIF") insurance contract furnished by Prudential Life Insurance and Annuity Company ("Prudential").[1] At year-end 2023, $108 million of the Plan's $664 million in assets were invested in the GIF. It was the Plan's single largest investment option, one that deserved the utmost of Defendants' care and attention.

7.      The GIF is a type of investment option referred to in the industry as a "stable value" contract.[2] Stable value contracts such as the GIF are specialty

---

[1] Empower Retirement acquired the retirement services business of Prudential in 2022, and the GIF provider now is Empower.

[2] This Complaint will avoid using the term "fund" to describe the GIF because the GIF is a general account insurance product that is a contract not a mutual fund. The industry term for a group annuity insurance contract such as the GIF is

insurance products found only in retirement plans. These products are not structured as mutual funds, but as general account fixed annuity group insurance contracts. Not only is the structure of a stable value product different from the structure of a mutual fund, but the product market is different, as are the tools available to monitor the investment's risk and performance. For a plan with a substantial investment in stable value such as the Plan – which had $59 million to $108 million invested in the GIF from 2019 to 2023 – a prudent process for monitoring the GIF would have involved, among other things, evaluating the terms and conditions of the GIF contract, researching the market and identifying the products that competed with the GIF, and testing the market by issuing requests for information and proposals at periodic intervals. Most plan sponsors do not have sufficient in-house expertise to monitor stable value products effectively. A prudent process must, in most cases, be implemented by a professional advisor or consultant with stable value expertise.

8.     The GIF is an entry-level product furnished by Prudential to retirement plans that lack the sophistication and bargaining power to access stable value products in the marketplace on more favorable terms – that is, greater returns for the same or less risk. Competitive stable value products are readily available to

---

"Guaranteed Income Contract" or GIC.  The term "GIF" is Prudential's trade name for this particular general account Prudential GIC.

plans like the Plan with a $59 to $108 million stable value investment and ready access to professional stable value advice. Unlike the Plan, the vast majority of these large, sophisticated plans take advantage of superior, well-structured offerings. The participants in the Plan earn less on their stable value investment because they happen to work for MyMichigan and not for a plan sponsor with a better stable value product.

9.      At year-end 2023, the Plan had $108 million invested in the GIF contract, giving it ready access to products furnished by Prudential's competitors to the Plan's peers. And yet, the Plan has retained the same entry-level GIF product from Prudential, with below market returns that have lagged the returns of Prudential's competitors by 1% to 2% or more each year since 2019. This resulted in a participant in the Plan earning substantially less on the Plan's stable value investment than he or she would if he or she had the same investment in one of the peer plans.

10.      Other plans with stable value bargaining power have fared far better by seeking and utilizing more competitive stable value products. The participants in these plans enjoy substantially higher crediting rates (the stable value contract equivalent of interest, by which "investment returns" are measured) for an equivalent level of risk (including credit, interest rate, and liquidity risk).

11.    Defendants had and continue to have a fiduciary obligation to identify and investigate the competitive stable value products readily available in the marketplace by, among other things, issuing requests for information and soliciting proposals from competing stable value providers. Defendants have not done this at all, or frequently enough to monitor the GIF effectively. Had Defendants implemented a prudent process for monitoring the GIF, they would have had access to competitively-priced stable value products furnished by Prudential's competitors, if not Prudential itself, with crediting rates that were 1% to 2% higher for the same or less risk.

12.    The PGAC's failure to monitor the GIF stable value option was and remains a violation of its fiduciary duties under ERISA, 29 U.S.C. 1104(a)(1). Had the PGAC prudently monitored the stable value marketplace and sought competing proposals, it would have discovered that the GIF's crediting rates were far below market and replaced it with a superior option. Instead, the PGAC sat idly by as Plan participants lost millions of dollars every year due to the GIFs below-market crediting rates.

13.    MyMichigan's failure to monitor the PGAC is a violation of its own independent fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1105(a)(2). As the ultimate governance authority for the Plan and the person that appoints members of the PGAC, MyMichigan had a duty to monitor the PGAC to

ensure that it performed its fiduciary role competently and consistent with ERISA's stringent requirements. After the PGAC persisted in failing to prudently monitor the Plan's stable value option, MyMichigan had a duty to intercede but failed to do so. MyMichigan, through the investment committee of its Board of Directors, also engaged in direct monitoring of Plan investments and would have identified the GIF's deficiencies had it discharged its fiduciary duties prudently.

14.     Defendants' persistent failure to prudently monitor the Plan's stable value product has caused the Plan to suffer more than $8 million in losses throughout the relevant period.[3] These losses continue to accrue as a result of Defendants' ongoing fiduciary failures.

15.     Plaintiffs seek recovery on behalf of the Plan of these losses; recovery of such additional losses as may accrue and compound through trial; and injunctive relief sufficient to correct the deficiencies in Defendants' fiduciary processes and protect the interests of participants in their retirement savings going forward.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil

---

[3] ERISA claims are subject to a six-year statute of repose. 29 U.S.C. § 1113(1). A failure to monitor investments during the six-year period is actionable notwithstanding the date of initial investment. *Tibble v. Edison*, 575 U.S. 523, 528 (2015). References to the "statutory period" mean the period that begins on the date that is six years prior to the date that this action was filed.

action on behalf of the plan to remedy violations of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §1132(e)(1) because this case presents a federal question.

18.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where the Plan is administered, where the breaches of fiduciary duty occurred, and where Defendants may be found.

## THE PLAN AND PARTIES

### THE PLAN

19.     The Plan is a "defined contribution plan" as defined by ERISA, 29 U.S.C. § 1002(34). The purpose of the Plan is to provide retirement benefits to eligible MyMichigan employees through the deferral of pre-tax wages and the investment of the resulting contributions in a menu of investment options selected and ostensibly monitored by Defendants. The Plan was formerly known as the "MidMichigan Health 403(b) Savings Plan."

20.     The Plan is tax-qualified under 26 U.S.C. § 403(b) and commonly referred to as a "403(b) plan." Plans that operate under section 403(b)'s beneficial tax scheme are administered by certain qualifying non-profits, including universities and hospitals such as MyMichigan.

21.     In defined contribution plans, each employee has an individual account. The benefits ultimately paid to the employee are a function of the amount the employee and employer contribute to the plan and the performance of the investments.

22.     Participants are limited to the investments selected by the Plan's fiduciaries and cannot choose alternative investments outside of the Plan's investment menu, even when the Plan's investments are inferior and superior investment alternatives are readily available in the marketplace.

23.     At the start of 2019, the Plan had $284 million in assets, of which $59 million was invested in the GIF, and 5,797 participants with account balances. At year-end 2023, the Plan had $664 million in assets, of which $108 million was invested in the GIF, and had 9,878 participants with account balances.

**PLAINTIFFS**

24.     Plaintiff Kevin Moffit had a portion of his account balance in the Plan invested in the GIF during the statutory period. His distribution from the Plan in 2022 would have been higher had Defendants prudently monitored the Plan's stable value contract and replaced the GIF with one of the many better performing investment alternatives available in the stable value market.

25.     Plaintiff Kevin Myers had a portion of his account balance in the Plan invested in the GIF during the statutory period. His distribution from the Plan in

9

2022 would have been higher had Defendants prudently monitored the Plan's stable value contract and replaced the GIF with one of the many better performing investment alternatives available in the stable value market.

### DEFENDANTS

26.    MyMichigan is designated on the Plan's Department of Labor (DOL) Form 5500 filings as the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). In this capacity, MyMichigan exercises ultimate discretionary authority and control with respect to the management and administration of the Plan, including the appointment of members of the PGAC, and determination of the scope of its fiduciary authority. Additional, through the investment committee of its Board of Directors, MyMichigan monitors Plan investments and has discretion to select and replace investments in the Plan. Thus, MyMichigan is a fiduciary of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i) and (iii). MyMichigan was formerly known as MidMichigan Health.

27.    According to the Plan's DOL Form 5500 filings, the PGAC, in coordination with the investment committee of MyMichigan's board of directors, "control[s] and administer[s] the Plan and manage[s] its investments." This constitutes "authority or control respecting management or disposition" of the Plan's assets, which makes the PGAC a "fiduciary" of the Plan as defined by

ERISA, 29 U.S.C. § 1002(21)(A)(i). On information and belief, the PGAC is composed of senior officers or directors of MyMichigan.

### ERISA'S FIDUCIARY DUTIES

28.     ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan …

    (A)   for the exclusive purpose of

        (i)   providing benefits to participants and their beneficiaries; and

        (ii)  defraying reasonable expenses of administering the plan;

    (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims[.]

These duties are "the highest known to the law." *Hall Holding Co.,* 285 F.3d at 426.

29.     ERISA fiduciary duties build on the common law of trusts. "Rather than explicitly enumerating *all* of the … duties of fiduciaries [in ERISA], Congress invoked the common law of trusts to define the general scope of their … responsibility." *Chesemore v. Fenkell*, 829 F.3d 803, 811 (7th Cir. 2016) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)).

30.    "If there is…a 'hallmark' of a fiduciary activity identified in the statute, it is prudence." *Sweda v. Univ. of Penn.*, 923 F. 3d 320, 333 (3d Cir. 2019). This is not a lay person standard, but instead "requires expertise in a variety of areas[.]" Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017).[4]

31.    Fiduciaries have a "duty to exercise prudence in selecting investments" as well as a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 575 U.S. at 528.

32.    The prudent investor rule's emphasis on monitoring recognizes that an investor's buying power, as well as the marketplace of available alternatives, will vary and change over time. *Id.* at 528 (finding that the "availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs" requires a strong duty to monitor); *see also Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (holding on remand that a fiduciary "cannot ignore the power the trust wields to obtain favorable investment products").

33.    In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on process. *Tatum v. RJR Pension Inv. Committee*, 761 F.3d 346, at 356–58 (4th Cir. 2014) (holding that prudence turns on whether the

---

[4] *Available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

fiduciary "employed the appropriate methods to investigate the merits" and "engaged in a reasoned decision-making process").

34.    Each dollar wasted is one less dollar in participants' accounts. These lost returns compound over time. The United States Department of Labor estimates that over the course of a career, earning 1% less in net returns per year will reduce a participant's savings at retirement by 28%.[5]

### FACTUAL ALLEGATIONS
### CONCERNING DEFENDANTS' BREACHES OF FIDUCIARY DUTY

#### PRODUCT AND PROCESS

35.    The Plan had the means to implement a prudent process to monitor the GIF and, upon discovering that the GIF's returns were below-market, the opportunity to replace the GIF with a stable value product that paid out a higher crediting rate to participants for the same or less risk.

36.    Smaller plans and ones with smaller stable value investments often do not have the means to hire a professional investment advisor or stable value consultant to investigate the alternative stable value options available in the marketplace. A plan with only a few hundred thousand dollars invested in a stable

---

[5] See Department of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

value contract would have to spend 10%–25% of the contract's value on a full product search. For such a plan, the potential gains do not justify the cost.

37.    It is common for stable value providers such as Prudential to offer small plans an entry-level stable value product such as the GIF on a take-it-or-leave it basis based on the assumption that, the small plan sponsor, lacking the resources of a larger plan, is unaware that better stable value options are available. It is more unusual for a large plan such as the Plan, which have ready access to professional advice, to fall into this trap.

38.    The situation for plans such as the Plan, a large plan with $50 million or more held in stable value, is markedly different. A full product search aided by a competent and knowledgeable advisor costs only a few basis points as a percentage of stable value assets (and less than a basis point if assessed across the entire plan).[6] The cost per dollar of testing the market is more than justified by the potential gains. Here, the additional interest earned in the first year from a prudent stable value product would have likely been 25 to 100 times more than the total cost of conducting a prudent product search.

39.    As the cost of a product search per dollar decreases, the size of the opportunity for gain increases. Stable value product providers generate revenue as a percentage of the assets invested. Product providers achieve substantial

---

[6] One basis point is equal to 0.01%.

economies of scale by capturing $50 million or more from a single customer and
are generally willing to pass some of those benefits back to customers in the form
of higher crediting rates to win the business. An eight-figure stable value
investment on the scale of the Plan's investment in the GIF not only makes product
due diligence cost effective, but the plan's bargaining position to obtain a higher
crediting rate is stronger as well.

40.    To implement a prudent process for monitoring the GIF, a plan such
as the Plan, with a substantial investment in stable value, must monitor the
products available in the stable value marketplace on an ongoing basis and solicit
bids from competing stable value providers at periodic intervals. This generally
requires the aid of a professional advisor or stable value consultant, because the
members of a typical plan fiduciary committee typically do not have sufficient in-
house expertise or resources to monitor the stable value market and solicit
competing bids. In any event, to discharge their duties in a prudent manner, Plan
fiduciaries may not rely upon advice from the plan's recordkeeper such as
Prudential/Empower which has a strong financial incentive in the plan's continued
use of the current GIF product. Prudential/Empower is not a fiduciary to the Plan
and is free to give advice and make recommendations that advance its own
interests at the expense of the Plan and its participants.

41.     The requirements for monitoring a stable value fund arise out of the characteristics of stable value products.  Mutual funds comprise substantially all non-stable value investments in 403(b) plans, but stable value contracts such as the GIF involve an entirely different investment vehicle and asset class. For fiduciaries accustomed to mutual funds, stable value products such as the GIF are not intuitive and require their own monitoring framework.

42.     Mutual funds are regulated under federal securities laws and must make robust public disclosures of fees, assets, performance, market benchmarks, and fund operations. Mutual funds are also structured intuitively and, in most cases, transparently to pass asset returns directly to investors, net of disclosed fees. A fiduciary can readily compare a mutual fund's fees and performance against the fund's self-selected market benchmark to monitor whether it is preforming in line with expectations. A fiduciary can likewise compare a mutual fund's performance and fees to similar mutual funds with the same investment objective. Low-cost subscription databases are readily available to fiduciaries that compile the entire universe of mutual fund performance, fee, and portfolio data and provide support tools designed to allow investors to quickly and effectively research and monitor mutual funds.

43.     Stable value contracts are different. A stable value product is similar to a money market fund in that it provides principal protection and liquidity, but

provides higher returns similar to bond funds. But, the similarities to mutual funds, and even to bond funds end there. Whereas the returns of bond funds are not guaranteed and the fund can lose money, the returns of general account stable value contracts such as the GIF are guaranteed. Principal protection for stable value products is provided by a guarantee – called a "wrapper" – that the stable value product will transact at "book value." In other words, a participant that deposits a dollar in the stable value product may withdraw the dollar plus interest credited to the participants' account (this interest is the "crediting rate"). The book value guarantee stabilizes returns. The value of the participants' interest does not rise and fall with changes in interest rates, as in the case of a bond fund.

44.     In addition to a guarantee of principal, the stable value contract may also guarantee a minimum rate of return. The crediting rate of a stable value fund often is reset at periodic intervals, by formula or in the case of products such as the GIF, at the discretion of the issuer. The guaranteed minimum establishes a floor below which the crediting rate may not be reset.

45.     There are two main types of stable value products found in 403(b) plans: general account products and separate account products.[7] In the case of

---

[7] There are also "synthetic" stable value products – structured as collective investment trusts (CIT) with bond portfolios supported by multiple insurance wrappers – that dominate the stable value market for large 401(k) plans. As a matter of historical accident in the drafting of the tax code, CITs are not qualified investments for 403(b) plans.

separate account products, deposits are placed in an insurance company separate account, where they are insulated from the claims of the insurance company's general creditors. In the case of general account stable value contracts, such as the GIF, the deposits are held unrestricted in the general account of the insurance carrier, where they are subject to the claims of the insurance company's general creditors.

46.     The crediting rates of general account stable value products are not typically bound to the performance of underlying assets in the provider's general account. Instead, the crediting rates are set by the product provider in its discretion. Many product providers, including Prudential/Empower, do not disclose how much investment revenue they earn on underlying assets compared to the crediting rate (called the "spread").

47.     A stable value product is less sensitive to changes in interest rates than conventional bond funds. Crediting rates rise more slowly than bond returns when interest rates rise and fall more slowly when interest rates drop. Stable value contracts are just that: stable, for better and for worse. A stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the fund selected by MyMichigan and the PGAC, generally continues to perform poorly, also in a stable manner.

Consequently, a fiduciary to a plan that fails to monitor an underperforming stable value fund has taken on a long-term problem.

48.     There are risks associated with stable value products that bond funds do not have. One is issuer risk. Whereas bond funds are diversified against the risk of payment default, stable value products are subject to the risk that the issuer of the GIC or wrap contract will default. Another risk is liquidity, restrictions on the ability of the plan or participants to remove or replace the stable value contract with another investment. Whereas a plan may replace a mutual fund on 60 days' notice or less, stable value contracts often impose restrictions on the replacement of the product. At the plan level, such restrictions may include a fixed surrender charge, a possible payout reduction based on market conditions, or a payout delay of up to a year or more, and at the participant level, such restrictions may include limits on transfers to competing investment options.

49.     Stable value products can also be divided into off-the-shelf products and custom products. An off-the-shelf product comprises the standard terms sold by a provider to a large number of plans. The rate-setting economics for an off-the-shelf product are based on the provider's generalized assumptions about asset levels, withdrawal rates, distribution and servicing costs, and competition in the marketplace for its standard customer. In a custom product, a plan with substantial buying power due to its assets invested in stable value is priced on its own terms,

which may yield a higher crediting rate or other more favorable terms and conditions.

50. All of these features make stable value products and, particularly, general account products like the GIF, less transparent than mutual funds. For these products, there is no objective or reliable securities benchmark that can be designated by the stable value product provider to measure the product's performance over time. The provider's compensation (the "spread") and the detailed formula or process used to determine the crediting rate are typically not disclosed. There are no subscription databases that have reliable and up to date information regarding current general account stable value product terms and historical performance. This lack of transparency is the reason that a plan sponsor such as MyMichigan must have access to a professional advisor with knowledge of the stable value market and must issue request for information and solicit competing bids from competing stable value providers at regular intervals. In the vast majority of cases, testing the market in this fashion with the assistance of a professional advisor or stable value consultant is the only prudent way to monitor a product such as the GIF.

51. The information that a 403(b) plan fiduciary with a substantial investment in a general account stable product must monitor includes:

- the committees' stable value expertise and need for a professional stable value consultant or advisor;

- the current crediting rate and contractual minimum crediting rate for the stable value product;

- the earnings history of the product over standard time intervals, including annual earnings and the 1, 3, 5 and 10-year averages;

- the rates offered by competing products to similar plans, including current, minimum, and long-term average rates;

- the rates offered by the leading providers in industry;

- market information derived from negotiations with the stable value provider, periodic requests for quotes, requests for information, and requests for proposal;

- limitations on transferring to a different stable value or other product, including any limitations on the plan's ability to exit the contract at book value;

- actors that determine whether a product's level of risk is appropriate, including the credit quality of the issuer.

52.    A fiduciary must assess its committee members' stable value expertise, or lack thereof, and engage a competent and knowledgeable advisor to fill any gaps. It is standard for fiduciaries with several billion dollars to retain advisors with expertise across asset classes and product types to provide ongoing consulting services. Stable value is its own asset class, and stable value consulting is a specific area of expertise among investment advisors.

53.    There are industry standard fiduciary processes that fiduciaries must implement to satisfy their duty to investigate and monitor general account stable value contracts.  Standard quarterly investment monitoring should include a review

of publicly available information regarding competitor products. While competitive information is more limited for general account stable value products than it is for mutual funds, the leading provider of general account products to 403(b) plans, TIAA, publishes current rates, annualized rates by year, and 5- and 10-year averages. Prudent monitoring of a general account stable value product must include tracking TIAA's publicly disclosed rates and long-term averages.

54.    A fiduciary must also regularly engage in a formal process known as "Request for Information" (RFI). An RFI goes beyond publicly available information and asks product providers to submit an overview of their products and terms. The marketplace for general account products in 403(b) plans is competitive and product providers regularly respond to RFIs in a as little as a few days. For general account stable value products, it is important for fiduciaries to conduct an RFI at least every few years in order to monitor the marketplace.

55.    A fiduciary must periodically engage in a formal process known as a "Request for Proposals" (RFP). This is done less frequently than an RFI because of the additional time and expense involved. An RFP goes beyond the product overview solicited via an RFI and allows the plan fiduciary to ask specific questions and request specific documents to further vet available products. An RFP process typically includes a meeting or series of meetings with prospective providers to allow the providers to develop their best offers and to allow the plan

fiduciary and its advisor to ensure that they understand each option. The RFP process provides an important opportunity for the plan fiduciary to negotiate with prospective providers and select the product that best serves the need of participants.

## LACK OF CARE AND LOST OPPORTUNITY

56.     The Plan has remained invested in the same inferior GIF stable value product over the entire statutory period. During that time, participants have contributed substantial retirement savings to stable value, increasing the Plan's investment in the GIF from $59 million in 2019 to $108 million at the end of 2023.

57.     As the size of its stable value investment grew, the Plan had sufficient and increasing bargaining power and resources to monitor the GIF and, upon identifying its deficiencies, to access a competitively priced replacement product available in the marketplace for similarly sized plans. But despite having the resources and bargaining power to access competitive stable value products, the Plan has retained the same underperforming GIF product.

58.     Had Defendants prudently monitored the GIF and the stable value marketplace, the GIF's deficiencies would have been readily apparent at the beginning of 2019. Over the five-year period from 2014 to 2018, the GIF's average annual crediting rate was 2.09%. The comparable version of TIAA's general account stable value product, the TIAA RC Plus, paid its investor plans an average

of 3.49% per year over the same period. This alarming earnings deficit relative to the leading provider should have put Defendant Committee on notice that it needed to put the Plan's stable value contract out for bid.

59.    The Plan's peers with more than $50 million in stable value investments have nearly unanimously invested in other general account stable value products with higher crediting rates furnished by TIAA and other providers. As shown below, in each year since 2019, the Plan has significantly underperformed the crediting rates earned by peer plans. The Plan's investment in the GIF also continued to underperform TIAA's comparable product, the RC Plus.



Peer Group Source: https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/foia/form-5500-datasets (last visited: Feb. 28, 2025)

|  | **2019** | **2020** | **2021** | **2022** | **2023** | **5-Year Avg.** |
|---|---|---|---|---|---|---|
| **Peer Group Weighted Average[8]** | 3.61% | 3.60% | 3.17% | 3.67% | 4.13% | 3.64% |
| **TIAA RC Plus** | 3.26% | 3.25% | 2.80% | 3.42% | 4.05% | 3.36% |
| **Plan's GIF** | 2.02% | 1.75% | 1.60% | 1.61% | 2.07% | 1.81% |

60.     Not only has the Plan's GIF consistently and substantially underperformed the average rate paid by stable value products in peer plans, the Plan sits near the bottom of the range. As shown below, the rates paid by the GIF averaged nearly 2 standard deviations below the average rates paid to peer plans between 2019 and 2023.

---

[8] The Peer Group Weighted Average is the asset-weighted average rate paid by general account stable value investments of $50 million or more held for the entire year by plans in the peer group. The peer group is comprised of all ERISA-governed defined contribution plans that (1) follow a January 1 to December 31 fiscal year, (2) report "interest credited" with respect to general account contracts on Schedule A to DOL/IRS Form 5500, and (3) had more than 2,000 participants with account balances and between more than $300 and $700 million in total assets as of year-end 2019.

|  | **2019** | **2020** | **2021** | **2022** | **2023** | **5-Year Avg. [9]** |
|---|---|---|---|---|---|---|
| **Peer Group Standard Deviation** | 0.61% | 0.86% | 0.55% | 0.72% | 0.92% | 0.73% |
| **Plan GIF vs Peer Group** | -1.59% | -1.85% | -1.57% | -2.06% | -2.05% | -1.82% |
| **Number of Standard Deviations Below Average** | 2.60 | 2.15 | 2.84 | 2.86 | 2.24 | 2.54 |

61.    The crediting rates earned by the peer plans' stable value products came with total protection of principal, and without exposing the plan to additional risk compared to the GIF.[10] Thus, the differences in rates are not attributable to the products offered by peer plans taking on additional risk; instead, they are the result of the scale, cost, and sophistication used to develop and deliver the product.

62.    The following histogram chart[11] summarizes the peer group

---

[9] For purposes of the standard deviation analysis, the "average" is the simple average, not the asset-weighted average.

[10] For example, TIAA has consistently maintained the same or superior credit rating compared to Prudential/Empower, which means that TIAA is deemed to expose investors to less risk of default on its guarantees.

[11] Each facet (panel) of the chart is a histogram of the peer group crediting rate information for a single calendar year of the Class Period. The source of the information is the Department of Labor database of Form 5500 filings by the plans in the peer group (including the MyMichigan Plan). The y-axis depicts the number of plans in the peer group at the crediting rate shown on the x-axis. There are five histograms, one for each year that peer group information presently is available (2019:2023). The peer group crediting rate information is separated into bins,

information in graphic form:



Source: https://www.dol.gov/agencies/ebsa/about−ebsa/our−activities/
public−disclosure/foia/form−5500−datasets (last visited: Feb. 28, 2025)

represented by a blue column. The upper and lower limit of each column along the x-axis (the sides of the column) represent the range of crediting rates for the bin (the width of the column). The y-axis (the height of the column) represents the number of plans from the peer group with crediting rates that fall into this range. The red circle in each histogram represents the crediting rate of the Plan, shown separately for emphasis.

63.    The distributions are bi-modal. In each year of the class period, the substantial majority of plans in the peer group have general account GICs with crediting rates that are mostly at market. This is represented by the cluster of columns on the right side of each of the 5 histograms.

64.    In each year of the class period, there is a smaller cluster of plans with general account GICs with crediting rates that are below market (for the same or substantially the same general account GIC stable value contract). In each year of the class period, the MyMichigan general account GIC is one of the severely underperforming general account GICs.

65.    The MyMichigan Plan had the means to test the market for the general account GICs and to replace the Prudential GIF with a better product. Had the MyMichigan Plan done this, the Plan would have been able to secure a general account GIC contract, on substantially the same terms as the GIF, with at market crediting rates.

66.    The difference between the below market cluster (including the Plan) and the at market cluster is substantial. Over the early part of the class period inflation was in the range of the federal reserve's target rate of 2%. The underperforming plans have crediting rates at or below the federal reserve's target inflation rate – that is, little or no real returns. The better performing plans have crediting rates well in excess of the federal reserve's target inflation rate – that is,

they have positive real returns (of 2% or more). The difference in bidding out a plan is the difference between earning a modest return (better performing plans) and losing money slowly (underperforming plans). This is not a difference in performance that a fiduciary with a prudent process would be willing to tolerate for any period of time.

67.    Superior products with higher crediting rates consistent with the peer averages were available to the Plan, had Defendants made a diligent effort to monitor and investigate the Plan's opportunities in the marketplace. For most if not all of the Class Period, the Plan was eligible to exit its GIF product at book value, and Defendants failed to take advantage of the Plan's opportunities.

68.    Defendants could have selected an off-the-shelf product with a proven track record of competitive rates, such as the TIAA RC Plus, which was available to the Plan during the relevant time and included in multiple peer plans.[12] Defendants also could have moved the Plan to a custom contract negotiated with Prudential or another provider. For example, AutoZone, Inc. was invested in the off-the-shelf Prudential GIF stable value product before bidding it out and replacing it with a lower risk stable value fund with higher crediting rates.

69.    The Plan's alarming earnings deficit relative to the weighted average rate paid in the relevant market is not the result of a few large plans having

---

[12] TIAA has offered the RC Plus product since 2006.

unusually high rates, with the rest of the market closely clustered around the Plan's rates. Rather, the alarming deficit relative to the peer group is the result of the mismanagement of the Plan's stable value investment option.

### PLAN LOSSES EXCEED $8 MILLION

70.    The cost of the Defendants' failure to implement a prudent process to evaluate its stable value fund, understand the relevant market, and test the market was more than over $8 million since the beginning of 2019 through year's end 2023. This measure of loss is the difference between the Plan's compound stable value earnings from the GIF and the stable value earnings the Plan would have generated had Defendants acted prudently and offered a competitive stable value product with crediting rates at least as high as TIAA's RC Plus between the start of 2019 and year-end 2023.

71.    The Plan's losses have continued, and will continue, to accrue and to compound from and after year-2023, until and unless Defendants remove and replace the GIF.

72.    The Plan's losses due to Defendants' imprudence passed through to the individual accounts of all Plan participants invested in the GIF.

### PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' FIDUCIARY BREACHES

73.    Plaintiffs did not have knowledge of all material facts necessary to state a claim until shortly before suit was filed. Further, Plaintiffs do not have

actual knowledge of the specifics of Defendants' decision-making and monitoring

processes with respect to the Plan because this information is solely within the

possession of Defendants pending discovery. For purposes of this Complaint,

Plaintiffs have drawn reasonable inferences regarding these processes based upon,

among other things, the investigation of counsel and the facts set forth above.

## CLASS ACTION ALLEGATIONS

74.    29 U.S.C. § 1132(a)(2) authorizes a participant or beneficiary of the

Plan to bring an action on behalf of the Plan to seek the remedies provided by 29

U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes a participant or

beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek

certification of this action as a class action pursuant to these statutory provisions

and Fed. R. Civ. P. 23.

75.    Plaintiffs assert their claims against Defendants on behalf of a class

(the "Class") of participants and beneficiaries of the Plan defined as follows:

> All Plan participants with a balance in the GIF at any time since the
> date that is six years prior to the date that this action was filed, along
> with their beneficiaries and alternate payees of record, excluding the
> members of the PGAC and any directors and officers of MyMichigan
> with fiduciary responsibility for the Plan's investments.

76.    **Numerosity:** The Class is so numerous that joinder of all Class

members is impracticable. The Plan has thousands of participants.

77.    **Typicality:** Plaintiffs' claims are typical of the Class members'
claims. Plaintiffs participated in the Plan and were exposed to the same below-
market returns on stable value assets as other Class members. Defendants managed
the Plan uniformly and treated Plaintiffs consistently with other Class members.
Defendants' imprudent actions and omissions affected all Class members similarly.

78.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of
the Class. Plaintiffs' interests are aligned with the Class that they seek to represent,
and they have retained counsel experienced in complex class action litigation,
including ERISA litigation. Plaintiffs do not have any conflicts of interest with any
Class members that would impair or impede their ability to represent such Class
members.

79.    **Commonality:** Common questions of law and fact exist as to all
Class members and predominate over any questions solely affecting individual
Class members, including but not limited to:

A.    Whether Defendants are fiduciaries of the Plan, and the scope
of their fiduciary duties;

B.    Whether Defendants breached their fiduciary duties under 29
U.S.C. §1104 by engaging in the acts and omissions described
herein;

       C.     Whether Defendants' fiduciary breaches caused losses to the

             Plan;

       D.     The proper form of equitable and injunctive relief; and

       E.     The proper measure of monetary relief.

80.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

81.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, will be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as replacement of investments or service providers or removal of Plan fiduciaries, will be dispositive of non-party participants' interests. The restoration of assets of the Plan required under 29 U.S.C. §§ 1109 and 1132 will be similarly dispositive of the interests of other Plan participants.

82.    Class certification also is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is

superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' performance of their fiduciary duties. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

### Violations of 29 U.S.C. §§ 1104(a)(1) and 1105 by MyMichigan

83.    Plaintiffs adopt by reference the foregoing factual allegations.

84.    MyMichigan is the ultimate governance authority with respect to the Plan, including the appointment of members of the PGAC, and determination of the scope of the PGAC's fiduciary responsibilities. Accordingly, MyMichigan is a fiduciary with respect to the Plan and has a duty of prudence to monitor the PGAC

appropriately. *See* 29 C.F.R. § 2509.75-8, D-4; *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984).

85.     MyMichigan has a duty to monitor the PGAC to ensure that it is engaging in appropriate fiduciary processes. The lack of any competitive process or marketplace review by the PGAC concerning the Plan's stable value contract, $108 million as of 2023, was a red flag to MyMichigan that the PGAC was not fulfilling its fiduciary duties. By failing to intervene, MyMichigan enabled the PGAC to continue to violate its fiduciary duties, and breached MyMichigan's own independent fiduciary duties to the Plan and Plan participants.

86.     MyMichigan further engaged in direct fiduciary investment monitoring the Plan's investments through the investment committee of its Board of Directors. MyMichigan performed this monitoring duty carelessly by failing to investigate appropriate competitive information necessary to determine that the GIF was costing participants millions of dollars each year due to its persistently low rates.

87.     MyMichigan is liable under 29 U.S.C. § 1109(a) to make good to the Plan all losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the information available to Plan participants to date.

88.    The Plan, Plaintiffs, and members of the putative class suffered losses or are reasonably likely to suffer future losses resulting from the foregoing fiduciary breaches of MyMichigan.

## COUNT II

## Violation of 29 U.S.C. §§ 1104(a)(1) by the PGAC

89.    Plaintiffs adopt by reference the foregoing factual allegations.

90.    The PGAC breached its fiduciary duties in connection with its monitoring and retention of the Plan's stable value investment option.

91.    The PGAC's fiduciary duties included managing the Plan's assets for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA.

92.    The PGAC is responsible for monitoring the Plan's investments on an ongoing basis and removing and replacing imprudent ones and taking all necessary steps to ensure that the Plan's assets are invested prudently. To do this, the PGAC had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses.

93.    As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

94.     The PGAC failed to implement a prudent process for selecting, retaining, or monitoring the Plan's stable value investment option. The Plan has had the same stable value option for many years, and its earnings are far short of what the Plan can obtain in the marketplace at the same level of risk. This breach would be rectified if the PGAC put the Plan's stable value contract out for bid, but the PGAC has not done so.

95.     The PGAC is liable under 29 U.S.C. § 1109(a) to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the information presently available, which is incomplete.

96.     The Plan, Plaintiffs, and members of the putative class suffered losses or are reasonably likely to suffer future losses resulting from the foregoing fiduciary breaches of the PGAC.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to its position but for this unlawful conduct;

E.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties, and replacing Committee members;

F.    Other equitable relief to redress Defendants' practices and to enforce the provisions of ERISA as may be appropriate;

G.    An award of pre-judgment interest;

H.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.    An award of such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Dated: March 18, 2025                **ENGSTROM LEE LLC**

/s/Jennifer K. Lee
Jennifer K. Lee, MN Bar No. 399012*
Carl F. Engstrom, MN Bar No. 396298**
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
jlee@engstromlee.com
cengstrom@engstromlee.com

**THE JAMES WHITE FIRM LLC**
James H. White IV, AL Bar No. 3611I58J**
2100 Morris Avenue
Birmingham, AL 35203
Telephone: (205) 317-2551

james@whitefirmllc.com

*Admitted in E.D. Mich.
**Motion for Admission forthcoming

**ATTORNEYS FOR PLAINTIFFS**